IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**KATHRYN E. KENEFICK**,                                          Civil Case No. 09-1243-KI

                Plaintiff,

    vs.                                                                      OPINION AND ORDER

**MICHAEL J. ASTRUE**,
Commissioner of Social Security,

                Defendant.


      Max Rae
      P. O. Box 7790
      Salem, Oregon  97303

            Attorney for Plaintiff

      Dwight Holton
      United States Attorney
      District of Oregon


Page 1 - OPINION AND ORDER

Adrian L. Brown
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon  97204-2904

David Morado
Regional Chief Counsel
Richard A. Morris
Special Assistant United States Attorney
Office of General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 221A
Seattle, Washington  98104-7075

       Attorneys for Defendant

KING, Judge:

Plaintiff Kathryn Kenefick brings this action pursuant to section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and

supplemental security income benefits ("SSI").  I reverse the decision of the Commissioner and

remand for a finding of disability.

## BACKGROUND

Kenefick filed applications for DIB and SSI on March 1, 2002, alleging disability

beginning July 1, 1994.  The applications were denied initially and upon reconsideration.

Kenefick's first hearing before an Administrative Law Judge ("ALJ") was on August 4, 2004.

On October 14, 2004, the ALJ issued a decision finding that Kenefick was not disabled within

the meaning of the Act, and therefore not entitled to benefits, and the Appeals Council declined

to review the decision on June 28, 2005.  Kenefick appealed that decision and, pursuant to a

Stipulated Order of Remand, the Honorable Michael R. Hogan remanded the case on June 19, 2006.

Kenefick again appeared before the ALJ at a hearing on September 27, 2006, along with a medical expert, Robert J. McDevitt, M.D.  On November 2, 2006, the same ALJ concluded again that Kenefick was not disabled.  The Appeals Council remanded the decision on April 21, 2007 because the ALJ had relied on the testimony of a medical expert, who in turn had testified the testing psychologist, and not the testifying expert, would have to interpret the spread between Kenefick's verbal IQ and performance IQ.

Kenefick waived appearance at the third hearing, held on December 13, 2007.  A different ALJ again concluded that Kenefick was not disabled.  This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on August 31, 2009.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his

physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability.  The evaluation is carried out by the ALJ.  The claimant has the burden of proof on the first four steps.  Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able

to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005).  Substantial evidence is more than a "mere scintilla" of the evidence but less than a preponderance.  Id.  "[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision."  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ first concluded that Kenefick's date last insured was December 31, 1999.  He then found that Kenefick suffered from the medically determinable impairments of depression, anxiety, posttraumatic stress disorder, personality disorder and carpal tunnel syndrome with successful release surgery done in April 2005.  However, the ALJ concluded none of these impairments or combination of impairments qualified as severe impairments.

Page 5 - OPINION AND ORDER

**FACTS**

Kenefick, who was born in October 1952, last worked as an in-house accountant until she was laid off (or fired, as she indicated in some reports) in 1994. She had previously worked at Sunset Magazine and, subsequently, as a hostess and waitress at a restaurant, while enduring a series of bad relationships and then raising two children. After the end of the last abusive relationship, Kenefick moved to Oregon in 1991 where her parents bought her a home. When her ex-husband died in October 1995, she was able to raise her two children on survivor's benefits until June 2003.

She alleges disability beginning in 1994, but her first complaint about depression was not until January 2001. William Hughes, M.D., treated Kenefick from April 21, 1995 through September 29, 1998 for routine medical problems. Although the handwriting is difficult to make out, Dr. Hughes does note that Kenefick mentioned having a "tough marriage" and "tough divorce" in June 1995 and "life stress" "ex husband" in September 1995. Tr. 257-258. Dr. Hughes did not see Kenefick again until January 2, 2001, at which time she reported seeing a counselor, having a difficult son, and feeling depressed and anxious. He prescribed Paxil. At follow-up appointments of January 12, February 6, March 15, and September 6, 2001, she continued to report depression, that she was seeing a therapist, and that her home stress was significant. She did not mention depression at either of her appointments in October and November 2002 when she saw Dr. Hughes for knee pain.

Kenefick saw Amber Post, MS, QMHP, a therapist at Catholic Community Service in December 2000. Kenefick reported experiencing problems with her angry son and of having had four to five anxiety attacks in her life. She reported not working "due to the stress and

Page 6 - OPINION AND ORDER

obligations regarding her son." Tr. 244.  Post diagnosed Adjustment Disorder and found her

clean, well-groomed, friendly, talkative, but "mildly depressed and anxious."  Tr. 244.  Post

reported, "Katy presents as a resilient and relatively healthy individual who tends to 'bounce

back' from stress . . . . Prognosis is good."  Tr. 246.  She assigned a Global Assessment of

Functioning at 65.[1]

    A therapist at Catholic Community Services, Carol Visto, saw Kenefick about twice a

month from December 2000 through April 2001, at which time Janet Vandecoevering began

treating Kenefick.  During a session in February 2001, Kenefick realized she had been depressed

most of the time and became scared that she could have a nervous breakdown just like her father

did when she was fourteen years old.  Vandecoevering treated Kenefick once a week to twice a

month beginning in February 2002 through July 2002, at which time Kenefick lost her Oregon

Health Plan coverage.  Vandecoevering began treating Kenefick again beginning October 2002

through June 2004.  Kenefick appeared late or with poor hygiene on a number of occasions.  She

described anxiety and depression off and on, as well as difficulty leaving her home.

    Vandecovering referred Kenefick to Rebecca Ross, RN, MSN for medication advice in

October 2001.  Kenefick reported to Ross that she believed her depression began in 1994 when

she was laid off.  Ross prescribed Effexor, and recommended increased exercise and eating a

balanced diet.  Ross treated Kenefick monthly from October 2001 through April 2002, and again

---

[1]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning.  A GAF of 61 to 70 means "**Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.**"  The American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 34 (4th ed. 2000) ("DSM-IV").

in August 2002, June 2003, and June 2004.  At the June appointment, Kenefick informed Ross

she had been off and on medications for about two months.  Kenefick began again regularly

seeing Ross, in July, August, October, and November 2004, but not again until June 2005.  Ross

did not treat her again until February 2006, at which time Kenefick had discontinued the Effexor,

reported feeling a little depressed at times only, but not "venturing too far out of comfort zone."

Tr. 684.  Ross encouraged exercise, yoga on video, and fiber.  Ross saw Kenefick again in June

2006, at which time she was complaining of increased anxiety and depression, but she was

pushing herself to do more outside of the house.  Kenefick left a message on February 9, 2007,

marked "low urgency" regarding a refill.  Kenefick saw Ross on March 1, 2007 at which time she

reported being out of her Lexapro for three weeks, experiencing increased bouts of crying,

fleeting thoughts of worthlessness, and of not getting dressed some days or leaving the house.

Ross refilled the Lexapro, increased the Trazadone to help with sleeping and refilled the

Alprazolam for anxiety as needed.  Ross encouraged Kenefick to volunteer, such as reading to

elders or helping a friend at work or at home.  The next appointment was "as needed or within 6

months." Tr. 691.

A number of examining and non-examining medical sources have shared their opinions

about Kenefick's condition.

Non-examining state psychologist Bill Hennings, Ph.D., opined in September 2002 that

there was insufficient evidence Kenefick suffered from a severe mental impairment from July

1994 to December 31, 1999.  He believed, however, that Kenefick had an Adjustment Disorder

with depressed mood, which caused moderate difficulties in maintaining social functioning.  He

also believed she had moderate limitations in understanding and remembering detailed

instructions, carrying out detailed instructions, interacting appropriately with the general public, and in setting realistic goals. Robert Henry, Ph.D., also a non-examining psychologist, agreed in March 2003.

On December 27, 2002, Vandecoevering wrote a letter to the Social Security Administration upon receiving word that Kenefick's application had been denied. Vandecoevering reported she did not believe Kenefick was able to work, that she had been treating Kenefick since April 2001 and that Kenefick had been experiencing "moderate-severe panic attacks on a nearly daily basis" as well as chronic anxiety and depression. Tr. 283. Despite medication, Kenefick continued to experience Generalized Anxiety Disorder, Panic Disorder with Agoraphobia, and Posttraumatic Stress Disorder without remission.

Robert Kruger, Psy.D., evaluated Kenefick in February 2003. She reported she was seeking Social Security benefits because, "I have no motivation. I'm depressed and I'm anxious. My depression has been building up for a long time–I'm not really sure for how long. My therapist thinks I have posttraumatic stress disorder. I think my depression came to a head after [I lost] my job at Cherry City [Electronics, in 1994]." Tr. 285. Dr. Kruger opined that Kenefick's "overall attention ability and capability of sustaining her attention on brief, basic, repetitive tasks were seen as good, such that she would be able to complete those tasks adequately within an appropriate period of time." Tr. 289. He found her intellectual functioning to be within the average range. He believed her reported symptoms reflected a diagnosis of Dysthymic Disorder[2] and Panic Disorder with Agoraphobia, and assigned a GAF of 62. She

---

[2]Dysthymia is "a mood disorder characterized by chronic mildly depressed or irritable mood often accompanied by other symptoms (as eating and sleeping disturbances, fatigue, and poor self-esteem)." http://www.merriam-webster.com/medlineplus/dysthymia (last visited Dec.

reported having panic attacks one or two times per month, with heart palpitations, trembling, chest discomfort, and shortness of breath.  She reported she had "learned how to 'cope' with her panic attacks, and commented, 'Now I can sort of control it.'"  Tr. 289.  She did not explain how she could control her panic attacks.

On June 14, 2004, Vandecoevering completed an analysis of Kenefick's functional capabilities, concluding that Kenefick had poor or no ability to remember and carry out short and simple instructions, maintain attention and attendance, and complete a normal workday without experiencing psychological symptoms.

Paul S. Stoltzfus, Psy.D., examined Kenefick on July 6, 2004.  She informed him she "decided to be a stay-at-home mom for the children" at the time of receiving survivor's benefits. Tr. 392.  She also reported having "every intent to return back to work when her children got bigger but she was experiencing increasing anxiety and depression and couldn't get motivated to return to work."  Id.  He noted her overall appearance was poor in that she looked disheveled, had taken a shower several days ago, and was anxious and tense through the first hour of the interview.  She became talkative and social as the interview continued, and reported she likes talking with people.  However, she is a complete recluse, hates to leave the house, and gets tired if anyone visits for too long.

Testing revealed a high average Full Scale IQ, an above average auditory memory, and a low to below average visual memory.  Further,

> The Millon Clinical Multiaxial Inventory indicate a high degree of being
> psychologically overwhelmed and disorganized and consequent tendency to over
> report the nature and severity of her problems.  She tends to view things in a

17, 2010).

pessimistic and negative light and under estimates her strengths. Her clinical profile on the Millon was consistent with clinical presentation with significant elevations for anxiety, chronic depression and episodic acute depression. Post Traumatic Stress Disorder index was moderately elevated.

. . .

She produced a problematic profile on the MMPI-II . . . with significant symptom exaggeration and characteristic non-defensiveness. Despite a tendency to over report all of her problems, her profile was relatively consistent with reported symptoms and responses on the Millon with relative elevations for depression and anxiety.

The patient's validity profile is indicative of exaggerating symptoms and problems as a plea for help (Graham 2000). She fits the rather familiar picture of a respondent with legitimate problems, who is exaggerating these difficulties in an effort to obtain attention and gain assistance.

Tr. 397. Dr. Stoltzfus diagnosed Dysthymic Disorder, Major Depressive Disorder in partial remission, Generalized Anxiety Disorder, Panic Disorder with agoraphobia, in partial remission, and Cognitive Disorder NOS (relative weakness for visual memory, coding and visual integration). He assigned a GAF of 45.[3] He opined that Kenefick's "[c]ombination of personality and psychiatric deficits presents significant barriers to employment. The client's presentation and test results indicate she is not capable of full time competitive employment where her anxieties, lack of confidence and depression would overwhelm her." Tr. 398.

Ross also submitted a letter containing her evaluation of Kenefick, dated July 22, 2004. After summarizing Kenefick's symptoms and diagnoses, Ross opined, "Kenefick is unable to obtain and maintain gainful competitive employment." Tr. 400.

---

[3]A GAF of 45 means that an individual has "**Serious symptoms** (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g. no friends, unable to keep a job)." DSM-IV at 34.

Page 11 - OPINION AND ORDER

Kenefick spent her days sleeping, watching TV, reading the newspaper, talking on the phone, and doing crossword puzzles. If she was motivated, she would do laundry and clean up the kitchen, but sometimes her daughter came over and cleaned for her.

At the hearing on September 27, 2006, after remand from the U.S. District Court of Oregon, the ALJ asked a medical expert to testify. Robert J. McDevitt, M.D. testified that Kenefick's treating providers had prescribed maximum doses of antidepressant medication for two to three years, and it had not been successful in treating her depression. He was troubled by the high dose of medication for the lengthy period of time. With a 100 verbal performance IQ, he believed she would function well. She had never been hospitalized. Her therapists did consistently comment on Kenefick's poor hygiene and housekeeping, but Dr. McDevitt did not know what that meant. He believed Kenefick's symptoms might rise to the level of "major depression[, b]ut most of the time, we're looking at Dysthymia." Tr. 716. In the end, he did not feel she met the listings of major depression, but "I would not disagree with her issue that she's not functional. I'm not quite sure whether I can assign any reason for it except personality style and personality function. . . . In general, part of her impairment is just that they -- she's on so much medication the last couple of years." Tr. 718. He thought a personality disorder might be the most logical diagnosis, but that would be a lifelong issue and she had had "fairly high functioning jobs through her lifetime." Tr. 722. He did mention that it was unusual to have such a spread between the verbal and performance IQ, but the testing psychologist would need to comment on that.

In answer to a question whether Kenefick could work 8 hours a day, 40 hours a week, he said, "[I]f she's in a job she enjoys and like[s], yes, I think she would do well." Tr. 720. He

believed that the medication she was taking around the 2004 time may have caused the lack of

personal grooming; "[w]hen you put a person without a mental disorder on 300 milligrams of

Effexor, they're not going to function very well."  Tr. 722.

## DISCUSSION

The ALJ rejected Kenefick's DIB and SSI claims at the second step, concluding that her

impairments did not qualify as severe impairments.

The threshold at step two is a low one.  The analysis consists of determining whether the

impairment significantly limits a claimant's ability to perform basic work activities.  20 C.F.R.

§§ 404.1520(c) and 416.920(c).  It is a "de minimis screening device [used] to dispose of

groundless claims."  Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (internal quotation

omitted).  "An impairment that is 'not severe' must be a slight abnormality (or a combination of

slight abnormalities) that has no more than a minimal effect on the ability to do basic work

activities."  SSR 96-3p.

With regard to evaluating the severity of mental impairments, the regulations direct the

ALJ to "rate the degree of [Kenefick's] functional limitation [based on]:  Activities of daily

living; social functioning; concentration, persistence, or pace; and episodes of decompensation."

20 C.F.R. §§ 404.1520a(c)(3) and 416.920a(c)(3).  The regulations further direct that if the ALJ

rates the limitation in the first three categories as "none" or "mild" and in the fourth category as

"none," the impairment is not severe unless the evidence indicates there is more than a minimal

limitation in the claimant's ability to perform basic work activities.  Id. at §§ 404.1520a(d)(1)

and 416.920a(d)(1).

After summarizing the medical evidence and Kenefick's testimony, the ALJ found the

following degrees of limitation:

> 1.  Restrictions in Activities of Daily Living are "Mild."  She functions
> independently, shops and manages finances.
>
> 2.  Difficulties in Maintaining Social Functioning are "Mild."  She reported she
> enjoys talking to people but indicated she has difficulty leaving the house.
> However, she does leave the house when necessary for shopping and
> appointments and she recently traveled to California with her brother.
>
> 3.  Difficulties in Maintaining Concentration, Persistence or Pace are "Mild."  Dr.
> Kruger indicated claimant's overall attention ability and capability of sustaining
> her attention on brief, basic, repetitive tasks was good and she would be able to
> complete those tasks adequately within an appropriate period of time.
>
> 4.  Episodes of Decompensation are "None."  She was fired or laid off from her
> last job (she has reported it both ways).  In either event, she did not stop working
> for any medically determinable reasons.

Tr. 506.

I.    <u>Lay Witness Testimony</u>

The ALJ did not address the testimony offered by Sharon Spencer, a neighbor and friend

since 1992, or Kenefick's brother's testimony, both of whom described Kenefick's condition

prior to 1999, her date last insured.  Additionally, he failed to mention Kenefick's daughter's

reports dated April 9, 2002 and December 14, 2002.

Spencer submitted a letter dated February 18, 2005, describing her observations of

Kenefick between 1996 and 1999.  She reported noticing Kenefick change from a confident,

outgoing, funny person to a person "less able to cope with every day things and . . . overwhelmed

by the simplest tasks, such as going to the grocery store."  Tr. 430.  She noticed Kenefick's house

becoming messier, with papers on the floor, dirty dishes on the counter, and laundry in the living

room.  She would find Kenefick crying in her dark living room.  Spencer has seen Kenefick outside of her home maybe five times in the last six years.

Jeffrey Gould, Kenefick's brother, also submitted a letter on behalf of Kenefick, dated February 24, 2005.  He reported that when she lost her job in 1994, it devastated her.  He and their mother were supporting Kenefick and when he inquired about a job she "would get very angry and say that she wasn't ready to go back to work."  Tr. 432.  When he visited from California in 1997 he remembers:

> I . . . realized she was not making any progress to gain employment or improve her lifestyle.  Her house needed a thorough cleaning; the laundry room floor was piled with dirty laundry which the cats had soiled.  The garage was a mess, filled with bags of trash that hadn't been put out for collection for weeks.  Even though it was a 2 car garage, there barely was room for her car.  On my next visit I found the same situation.  She seemed to be mired in a state of inertia, passing the days watching television.  When she needed food for dinner, she would drive to the grocery store and only buy a little food at a time.  It appeared that she wasn't able to plan her meals in advance and cut down on the numerous visits to the grocery store.  When I tried to talk to Katy about any of these things, she would get very angry and defensive, and scream about how she was doing the best she could.  In retrospect, I believe she probably was.

Tr. 432.

Additionally, Kenefick's daughter wrote that her mother only went out when she had to and that she put off errands for as long as possible.  She had trouble falling asleep, woke up frequently at night, and had not cleaned her room in five months.  She watched about 12 hours of television a day.  She did not clean up after meals, and never dusted, vacuumed, took out the trash, or did yard work because she had no motivation.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness.

Page 15 - OPINION AND ORDER

Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006).  Additionally, "where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."  Stout, 454 F.3d at 1056.

The Commissioner argues the ALJ "inferentially" rejected the lay witness statements because the ALJ found Kenefick's testimony not entirely credible and the statements were similar to Kenefick's testimony.  Def's. Br. at 14.  He also suggests that even fully crediting the testimony, no reasonable ALJ could have reached a different disability determination.

I am not permitted to read into the ALJ's decision something which is not there.  The ALJ is required to discuss the lay testimony.  See Stout, 454 F.3d at 1053 ("ALJ must consider lay witness testimony").  Furthermore, I cannot find harmless the ALJ's failure to consider the lay evidence.  Spencer and Gould testified about what they personally observed prior to Kenefick's date last insured:  Spencer watched Kenefick change from a confident person to someone who rarely left the house and Gould observed a completely unmotivated person, unable to perform household chores, and unable to even consider applying for a job.  Kenefick's daughter also described her mother's reclusive habits.  No reasonable ALJ could conclude Kenefick did not have a severe impairment when fully crediting this evidence.  In fact, these statements demonstrate that Kenefick could not have performed work on a sustained basis.  The ALJ erred and the error is not harmless.

II.    <u>Medical Evidence</u>

Kenefick argues the ALJ erred in rejecting Dr. Stoltzfus' opinion and in rejecting the limitations noted by Vandecoevering and Ross.  She also contends the ALJ misrepresented Dr. McDevitt's testimony.

The ALJ accepted testifying expert Dr. McDevitt's opinions over the opinions of Kenefick's examining and treating providers, concluding that Kenefick had no limitations from any mental impairments lasting for 12 months or longer.  He also relied on Dr. Kruger's evaluation that Kenefick could sustain concentration, persistence and pace in basic, repetitive tasks.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  <u>Orn v. Astrue</u>, 495 F.3d 625, 632 (9th Cir. 2007).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  <u>Id.</u> (treating physician); <u>Widmark v. Barnhart</u>, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record.  <u>Orn</u>, 495 F.3d at 632; <u>Widmark</u>, 454 F.3d at 1066.  The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician.  <u>Widmark</u>, 454 F.3d at 1066 n.2.  Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence

when they are supported by and are consistent with other evidence in the record.  Morgan v.

Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).

      A.    Dr. Stoltzfus

      The ALJ declined to accept Dr. Stoltzfus' conclusions about Kenefick's functioning.  He

first opined that Kenefick's attorney's referral to Dr. Stoltzfus "renders the resulting opinion

suspect[.]"  Tr. 504.  He also found that Dr. Stoltzfus' opinion that Kenefick's depression, lack of

confidence and anxiety would preclude work was "not consistent with the treatment record[.]"

Id.  The ALJ recited the following factors in support of his decision:  (1) Kenefick reported she

could control her panic attacks; (2) she had never been hospitalized or had a psychiatrist treat her;

(3) the diagnosis of cognitive disorder was not supported by the testing, which indicated

Kenefick had an average to superior IQ; (4) Kenefick's score on the MMPI-2 demonstrated she

exaggerated her symptoms; and (5) the opinion was based on Kenefick's complaints without

objective corroboration.

      As an initial matter, the Commissioner concedes it is irrelevant that Kenefick's attorney

hired Dr. Stoltzfus.  Lester v. Chater, 81 F.3d 821, 832 (9th Cir. 1995) ("The purpose for which

medical reports are obtained does not provide a legitimate basis for rejecting them.").

      It is true that Kenefick never had a psychiatrist treat her and was never hospitalized.  It is

also true that Kenefick told Dr. Kruger she could control her panic attacks.  However, Kenefick

explained to Dr. Stoltzfus how she could control them; she explained she did not have panic

attacks on a daily basis because she stayed home, but when she left the house, she was anxious

and sometimes had panic attacks.  Kenefick's ability to control her panic attacks by remaining at

home does not undermine Dr. Stoltzfus' opinion about Kenefick's inability to work.

With regard to the ALJ's conclusion about Dr. Stoltzfus' diagnosis of cognitive disorder, the ALJ improperly rejected the diagnosis based on the IQ test results. As Dr. Stoltzfus specifically indicated, his diagnosis of cognitive disorder was based on Kenefick's "relative weakness for visual memory, coding and visual integration" and that Kenefick's "[o]verall cognitive profile suggests considerable decline in cognitive functioning across various domains with Verbal IQ providing baseline. . . . The client's experience of vacillating memory and concentration is secondary to mood disregulation." Tr. 397-98. The Appeals Council recognized this in its Order Remanding Case to Administrative Law Judge, explaining that Dr. Stoltzfus' diagnosis "was due to claimant's vacillating memory and concentration rather than her IQ scores." Tr. 534. Accordingly, the ALJ erred in rejecting Dr. Stoltzfus' diagnosis of cognitive disorder.

As for the MMPI-2 results, Dr. Stoltzfus specifically concluded the test results "are considered valid." Tr. 395. He viewed the results as consistent with Kenefick's reported symptoms and reflected a "plea for help. She fits the rather familiar picture of a respondent with legitimate problems, who is exaggerating these difficulties in an effort to obtain attention and gain assistance." Tr. 397. Again, the Appeals Council recognized this conclusion, noting, "Dr. Stoltzfus did not find the MMPI results to be invalid, but opined her profile was relatively consistent with reported symptoms and as a 'plea for help.'" Tr. 534. Consequently, the ALJ had no basis to read the results as reflecting an invalid performance.

Finally, Dr. Stoltzfus adequately supported his opinion with a battery of tests and did not rely entirely on Kenefick's subjective complaints.

The ALJ erred in rejecting Dr. Stoltzfus' psychological evaluation because he failed to set forth specific and legitimate reasons for giving the opinion no weight.

B.    Janet Vandecoevering

The ALJ found Vandecoevering's opinions entitled to no weight.  He relied on the fact that she is not an acceptable medical source, and he believed she based her conclusions on Kenefick's complaints and not on any objective findings.  The ALJ believed that the fact that because Vandecoevering never learned of Kenefick's "longstanding and ongoing alcohol consumption of 2-3 glasses of wine up to 3-times a week," her assessment was entitled to no weight.  Tr. 504.

As an initial matter, the fact that Vandecoevering is not considered an acceptable medical source is not alone a sufficient reason to reject her opinion with respect to the severity of Kenefick's impairments.  20 C.F.R. §§ 404.1513(d), 416.913(d) (other sources may be considered when evaluating severity of impairments).  In considering the opinions of other medical sources, the ALJ should consider:  (1) how long the source has known the claimant and how frequently the source has seen the claimant; (2) whether the opinion is consistent with other evidence; (3) the degree to which the source presents relevant evidence supporting an opinion; (4) how well the source explains the opinion; and (5) whether the source has a specialty or area of expertise related to the claimant's impairments.  SSR 06-03p.

Vandecoevering had a long treating relationship with Kenefick, beginning in April 2001 through at least June 2004, during which time she saw Kenefick at least twice a month.  During that time, Vandecoevering repeatedly observed Kenefick's poor hygiene, the fact that she missed or was late for appointments, and her tearfulness and anger during appointments.  Indeed, in

support of her work assessment, Vandecoevering specifically mentioned her observations that

Kenefick "presents most sessions with restlessness, grave difficulty focusing, irritability, muscle

tension and occasional panic."  Tr. 378.  These are symptoms Vandecoevering herself observed.

Consequently, some of the limitations Vandecoevering found did not come "exclusively from the

claimant's subjective allegations of symptoms" as found by the ALJ.  For example, her opinion

that Kenefick had poor or little ability to regularly attend and be punctual for work is supported

by Vandecoevering's observations, as is her opinion that Kenefick had poor or no ability to

maintain attention for two-hour periods of time.  Finally, it is not clear how Vandecoevering's

lack of knowledge regarding Kenefick's use of alcohol is relevant to the weight that should be

given Vandecoevering's opinion.  The ALJ did not find that alcoholism was a medically

determinable impairment and he, in fact, concluded that it was "not a material factor in reaching

a determination of disability."  Tr. 506.  There is no evidence in the record indicating

Vandecoevering's functional limitation assessment would be different had she known that

Kenefick drank two to three glasses of wine up to three times a week.  The ALJ's rejection of

Vandecoevering's work assessment was not supported by substantial evidence.

    C.    <u>Rebecca Ross</u>

    The ALJ did not address Ross' opinions regarding Kenefick's functional limitations.

Instead, he noted that Kenefick's visits to Ross had recently been sparse.  Ross treated Kenefick

on June 22, 2006 and Kenefick's next contact was an "Urgency:  Low" telephone call for an

appointment on February 9, 2007.  Tr. 690.  Kenefick's appointment took place on March 1,

2007 at which time Ross noted, "1st contact for over 9 months" in her report.  Tr. 691.  Kenefick

had been out of Lexapro for three weeks and had not been taking it regularly.  Kenefick reported

increased anxiety with daily crying and feeling emotional. "Life is very minimal–doesn't get dressed some days, doesn't want to leave the house, not motivated to do much." Id. The ALJ pointed out Kenefick was only taking Xanax at the first sign of a panic attack. He also recited the fact that Kenefick was drinking alcohol "1-to-2 glasses up to three times a week." He suggested that Ross did not accept Kenefick's allegation about not wanting to leave the house since Ross suggested volunteer work or helping a friend at work or at home. Ross saw no need for urgency in treatment, scheduling Kenefick for follow-up in six months or sooner as necessary. The ALJ also noted that Ross' determination of disability was based on Kenefick's "subjective and self-serving complaints of disability[.]" Tr. 504.

I agree with Kenefick that there is no indication in Ross' note indicating Ross did not believe Kenefick about her anxiety in leaving the house. Ross merely encouraged Kenefick to leave the house in a volunteer capacity, presumably to counter Kenefick's feelings of worthlessness.

However, Kenefick suggests that the ALJ drew the wrong conclusion from Ross' note regarding Kenefick's Lexapro refill, assuming that Kenefick had "not been taking it at the prescribed times and dosages." Tr. 503. Contrary to Kenefick's view of the evidence, the ALJ could properly have construed the fact that Kenefick had been out of her Lexapro for three weeks to mean she was not taking her daily pill and was therefore not complying with the prescription. Furthermore, the length of time between visits, the lack of urgency in the need for visits, and the fact that Ross (unlike Vandecoevering) did not identify any objective findings supporting her opinions regarding Kenefick's functional limitations, are sufficient reasons for the ALJ to give no weight to Ross' opinions. See Batson, 359 F.3d at 1195 (ALJ is not required to accept the

Page 22 - OPINION AND ORDER

opinion of a physician, even a treating physician, if the opinion is "brief, conclusory, and inadequately supported by clinical findings").

    D.    <u>Dr. McDevitt</u>

The ALJ gave "more weight" to Dr. McDevitt's testimony because he:  (1) reviewed the evidence; (2) observed Kenefick testify; and (3) his testimony was well-supported.  Kenefick challenges these conclusions.

Dr. McDevitt opined that Kenefick did not meet the "listings for depression" (Tr. 717); that she might have a personality disorder, which would be a lifetime disorder but there were times when she was highly functional; and that Kenefick's treating providers were over-medicating her.

I agree with Kenefick, however, that the ALJ misrepresented much of Dr. McDevitt's testimony.  For example, the ALJ reported Dr. McDevitt testified Kenefick failed to respond to treatment "primarily from non-compliance with her medication regimen."  Tr. 503.  Dr. McDevitt did not say that.  Instead, he reported she had been on the maximum dose of antidepressant medication for two or three years and it did not seem to be doing anything for her.  The ALJ reported Dr. McDevitt testified that Kenefick "left work in 1994 but not because of any documented or objectively determined impairments."  <u>Id.</u>  Dr. McDevitt made no such statement.  The ALJ stated Dr. McDevitt believed Kenefick's anxiety problems "could be related to being overly medicated with Xanax."  <u>Id.</u>  Instead, however, Dr. McDevitt believed the Effexor and Wellbutrin contributed to Kenefick's motivation and hygiene problems.

Notably, and contrary to the ALJ's summary, Dr. McDevitt seemed to accept that Kenefick suffered from some level of depression, at least at times.  He testified, "[T]he

depression is not–from a standpoint, it may rise at times to the level of a major depression.  But

most of the time, we're looking at Dysthymia."  Tr. 716.  He also "would not disagree with her

issue that she's not functional" although he testified he could "not assign any reason for it except

personality style and personality function."  Tr. 718.  He commented that the medication regimen

and counseling had "not really addressed some of the causes or issues here," again suggesting

that Kenefick did demonstrate some limitations.  He testified that "she doesn't have the kind of

depression that responds to medication," that he didn't "have a good notion of when she really

stopped functioning" and "she's not totally dysfunctional all the time."  Tr. 720.  He also

recognized "[s]he may have some–the anxiety issues are identified, so one would have an

anxiety."  Tr. 717.  Furthermore, given his acceptance of her personal hygiene issues, being

overwhelmed easily, and her organization problems, Dr. McDevitt did not explain his opinion

that Kenefick would be able to work if she liked her job.

  In sum, the ALJ did not accurately report Dr. McDevitt's testimony, which was not all

that clear or persuasive to begin with, and the testimony does not support the ALJ's conclusion

that Kenfick does not have any "limitations from her alleged symptomology[.]"  Tr. 504.  Since

the ALJ failed to give specific and legitimate reasons to accept the opinion of Dr. McDevitt, a

non-examining medical expert, over the opinions of Dr. Stoltzfus, an examining physician, and

Vandecoevering, a treating provider, his decision that Kenefick has no severe impairments is not

supported by substantial evidence.

III. Plaintiff's Testimony

  Plaintiff challenged the ALJ's conclusion that her allegations of mental impairment were

not entirely credible.  The ALJ concluded that because there was no record of treatment prior to

Page 24 - OPINION AND ORDER

2001, Kenefick's allegations of disability beginning in 1994 were not entirely credible.

Additionally, she was fired from her last job; she did not leave because of her impairments.  She

also reported at various times that she did not return to work because of her desire to be a stay-at-

home mom and due to obligations to her son.  The ALJ viewed her treatment since 2001 as

necessary to deal with family issues "not symptoms of depression or anxiety" and she had only

experienced four or five panic attacks in her life as of 2001.  Tr. 501.  She reported she learned to

cope with her panic attacks.  The ALJ did not accept Kenefick's assertions of memory problems

since she did well on testing.  He also viewed the MMPI-2 test results as demonstrating a

tendency to exaggerate.  He concluded that there was no documented verification of Kenefick's

limited functioning and he noted she left her house to go grocery shopping and to eat out at

restaurants with her brother and daughter.

The ALJ summed up his view of Kenefick's credibility by opining she was motivated to

seek benefits for secondary gain reasons; Kenfick's children had been receiving benefits and the

youngest child had moved out "rendering the claimant with no further monetary support and

desperate."  Tr. 505.  Also, the ALJ did not favorably view Kenefick's decision not to testify at

the third remand hearing and that, as a result, she "has failed to meet her burdens of proof and

persuasion."  Tr. 506.  She also did not go to a consultative psychological examination as

arranged by the Appeals Council, without explanation.

When deciding whether to accept the subjective symptom testimony of a claimant, the

ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective

medical evidence of one or more impairments which could reasonably be expected to produce

some degree of symptom.  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).  The

claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  Id.  The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony."  Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001).  General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence.  Id.  "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).

The ALJ did not make a finding of malingering and, therefore, was required to set forth clear and convincing reasons for finding Kenefick not entirely credible.  As an initial matter, although Kenefick's first visit to a physician to treat her mental impairments was not until 2001, the reports of Kenefick's neighbor and brother are adequate to show she had functional limitations at least as of 1997.  As I concluded above, the ALJ erred in failing to consider the lay witness evidence.  Furthermore, an ALJ must proceed with caution when holding the lack of treatment against a claimant alleging mental impairments.  See Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) ("appellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation").

The lay witness evidence also undermines the ALJ's conclusion that there was no objective support for Kenfick's reports of limited daily activities, and that Kenefick's problems were related to her son's legal issues, since the son's problems did not occur until 2000.

Additionally, for the reasons I indicate above, the ALJ was wrong to discount Kenefick's testimony based on her reports that she was able to control the panic attacks, because she later explained she did so by staying home. He also erred in reading the MMPI-2 results the way he did when no physician viewed those results as showing a tendency to exaggerate. Additionally, Dr. Stoltzfus opined, and there is no evidence to the contrary, that Kenefick's "experience of vacillating memory and concentration is secondary to mood disregulation," thereby supporting Kenefick's claims of memory problems. Tr. 398.

Nevertheless, the ALJ was proper to question whether 1994 was in fact the alleged onset date of Kenefick's disability when she was fired (or laid off) for reasons unrelated to her mental health and when she reportedly decided to be a stay-at-home mom rather than find a job.

On the whole, the ALJ's failure to consider Kenefick's credibility, in light of the lay witness statements about Kenefick's symptoms, was in error. See SSR 96-7p ("the adjudicator must consider all of the evidence in the case" when symptoms are not substantiated by the objective medical record).

IV.    Remedy

The ALJ's failure to provide any reasons for rejecting competent lay testimony, when the error was not harmless, and his acceptance of Dr. McDevitt's testimony over the opinions of Dr. Stoltzfus and Vandecoevering, without providing specific and legitimate reasons for doing so,

was error.  The evidence, if properly considered, would result in a finding that Kenefick suffered from a severe impairment and could not perform work tasks on a sustained basis.

Kenefick asks me to remand for a finding of disability.  The Commissioner requests a remand for further proceedings so the ALJ can evaluate Kenefick's residual functional capacity and make a determination as to whether Kenefick could have performed her past work or other work in the national economy.

The court has the discretion to remand the case for additional evidence and findings or to award benefits.  McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  The court should credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited.  Id.  If this test is satisfied, remand for payment of benefits is warranted regardless of whether the ALJ might have articulated a justification for rejecting the evidence.  Harman v. Apfel, 211 F.3d 1172, 1178-79 (9th Cir.), cert. denied, 531 U.S. 1038 (2000).

The "crediting as true" doctrine resulting in an award of benefits is not mandatory in the Ninth Circuit, however.  Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003); Vasquez v. Astrue, 572 F.3d 586, 593 (9th Cir. 2009) (recognizing split within the circuit on whether the rule is mandatory or discretionary but not resolving the conflict).  The court has the flexibility to remand to allow the ALJ to make further determinations, including reconsidering the credibility of the claimant.  Connett, 340 F.3d at 876.

I find that this is the unusual case in which a remand for a finding of disability is the appropriate resolution. The statements of Gould, Spencer, and Kenefick's daughter, and the opinions of Dr. Stoltzfus and Vandecoevering, amply demonstrate that Kenefick suffers from functional limitations that are inconsistent with her ability to perform full-time work, and that she has experienced these limitations since at least December 31, 1999. A remand for benefits is especially warranted where, as here, Kenefick has undergone extensive administrative and court proceedings for the past eight years. See Vertigan v. Halter, 260 F.3d 1044, 1053 (9th Cir. 2001).

## CONCLUSION

The decision of the Commissioner is reversed. The case is remanded for a finding of disability as of December 31, 1999.

IT IS SO ORDERED.

Dated this _____4th_____ day of January, 2011.

＿＿ /s/ Garr M. King ＿＿＿＿＿＿＿＿
Garr M. King
United States District Judge